UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| EUNICE LAWSON, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 4:12 CV 396 DDN ) |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | ) ) ) |
| Defendant. | ) ) |

## **MEMORANDUM**

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Eunice Lawson for supplemental security income under Title XVI of that Act, 42 U.S.C. § 1381, et seq. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 7.) For the reasons set forth below, the decision of the Administrative Law Judge is affirmed.

## **I. BACKGROUND**

Plaintiff Eunice Lawson, who was born on December 18, 1962, filed an application for Title XVI benefits on November 14, 2008. (Tr. 116-18.) She alleged an onset date of disability of November 4, 2008, due to bipolar disorder, schizophrenia, and attention deficit disorder. (Tr. 153-54, 191-98.) Plaintiff's applications were denied initially on February 9, 2009, and she requested a hearing before an ALJ. (Tr. 59-67.)

On June 8, 2010, following a hearing, the ALJ found plaintiff was not disabled. (Tr. 17-25.) On February 1, 2012 the Appeals Council denied plaintiff's request for review. (Tr. 1-3.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## **II. MEDICAL HISTORY**

Plaintiff entered the ninth grade in 1978. During the first semester of ninth grade, plaintiff received no credits or grades due to absenteeism. During the second semester, she failed all of her classes. (Tr. 265.)

On June 17, 2005, plaintiff sought treatment at the Human Service Center and reported breakdowns. During the breakdowns, plaintiff lost control and kicked and screamed. She also reported periods of inactivity and isolation as well as periods of "over energization." During the periods of "over energization," plaintiff experienced racing thoughts and poor concentration and changed tasks frequently. She further reported that she had numerous suicidal thoughts during the past two years and on one occasion attempted to overdose. Narayana Reddy, M.D., initially assessed bipolar II disorder and cocaine dependence. (Tr. 310-19).

On June 30, 2005, plaintiff received a psychiatric evaluation from Dr. Reddy. Plaintiff reported that she last sought psychiatric treatment in Kansas City before moving to Peoria in 2002. Her mother also received treatment at the Human Service Center and referred plaintiff due to her mood swings and depressive symptoms. Plaintiff reported that she abused alcohol and crack cocaine during the 1990s but was currently sober. She complained of feeling angry and irritable. She had a breakdown during the previous weekend and would have gone to the emergency room if she had transportation. She denied suicidal or homicidal ideation, and Dr. Reddy found her denial convincing. Although she denied hearing voices, she reported hearing whispers. Plaintiff stated that she was unemployed and unable to maintain a job. Dr. Reddy diagnosed polysubstance abuse and decided to test for bipolar disorder. Plaintiff received a GAF score of 50.[1] Dr. Reddy prescribed Geodon.[2] (Tr. 320-21.)

---

[1] A GAF score, short for Global Assessment of Functioning, helps summarize a patient's overall ability to function. A GAF score has two components. The first component covers symptom severity and the second component covers functioning. A patient's GAF score represents the worst of the two components.

  A score from 41 to 50 represents serious symptoms (such as thoughts of suicide, severe obsessional rituals, frequent shoplifting), or any serious impairment in social, occupational, or school functioning (such as the inability to make friends or keep a job). American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 32–34 (4th ed. 2000) ("DSM-IV-TR").

[2] Geodon is used to treat mental or mood disorders such as schizophrenia or manic episodes associated with bipolar disorder. WebMD, http://www.webmd.com/drugs (last visited on March 26, 2013).

On July 29, 2005, plaintiff complained of increased irritability in the mornings, but reported that medication helped at night. Dr. Reddy continued plaintiff on Geodon. Plaintiff received a GAF score of 50. (Tr. 322.)

On August 26, 2005, Mary Lawson, plaintiff's mother, spoke with the Illinois Bureau of Disability Determination Services regarding plaintiff's daily activities. Mary Lawson reported as follows. Plaintiff lives in the homes of her family members who accept her and want to prevent her from sleeping in the street. She spends about two nights per week with her mother but has no definite schedule for where she stays. (Tr. 347.)

During conversation, she jumps from topic to topic. She often sits alone and converses with herself. She hears voices on a regular basis, which frightens her. She cannot always understand the voices but believes that "they are out to get her." She tries to stay awake at night due to her fear of the voices. She paces constantly, and at night her family locks the doors to prevent her from leaving the house. She sees things that are not there. She often cries and pulls her hair. She believes that everyone but her family hates her and only gets along with family members. She is suspicious of others and often wears a small "cutter" on her finger for protection. Her family is supportive and tries to help. (Id.)

Plaintiff would neglect her personal hygiene without the instruction of her family. For example, she must be told to take baths, and she wears mismatched clothes. Her family provides her meals, and her mother does not trust her to cook or shop independently. She does not do chores on a regular basis. Plaintiff receives counseling, but her mother is uncertain regarding her attendance. She must be reminded daily to take her medications. (Tr. 347-48.)

Plaintiff sits and stares for long periods of time. She smiles inappropriately and lacks interest in any activity. She used to enjoy attending church with her sisters, but she no longer attends. Occasionally, she reads Christian books, but she does not understand them. Conversing with more than one person frustrates her and causes her to walk away. (Tr. 348.)

Her family confiscated her bicycle that she used for transportation because of her inattentiveness on the road. Her family usually provides transportation, but she can ride the bus without getting lost. She judges character poorly and does not maintain lengthy friendships. She does not use alcohol, tobacco, or other recreational drugs. (Id.)

On August 29, 2005, Mac Bradley, Ph.D., performed a psychological consultation. When

asked to describe her disabilities, plaintiff responded that she has been called bipolar because she becomes "upset out of just nowhere" and that she has been diagnosed with schizophrenia due to her aversion to crowds. She reported that she believes "everybody is against her" and that crowds cause her to lose her breath. She had no stable job and becomes very frustrated while working. She stated that "the other day I heard someone calling my name and sometimes I hear babies crying," but did not describe hearing voices as bona fide hallucinations. Other than stating that her mind "goes too fast for her," she described no indication of bipolar disorder or other psychopathology. (Tr. 343.)

Plaintiff described herself as a drifter who sleeps where she can. She has two children but has no contact with one child and only infrequent contact with her other child. She also stated that her father is deceased and that she has infrequent contact with her mother and siblings. Although she stated that she recently lived with a friend, she denied having friends. (Tr. 344.)

Dr. Bradley found obtaining information regarding her daily activities difficult. He noted that she maintained her own hygiene. She described her activities vaguely, stating only that she sits outside. She reported that she receives financial support from her friends and family and manages her own money. She completed ten years of public education and received average to below average grades. She repeated the seventh grade and later dropped out of school. She obtained a GED in her mid-twenties. Plaintiff had no job at the time of the evaluation but worked at a staffing company five months earlier for three days. She also previously worked as a factory worker, cashier, and waitress. She reported that she had never spent longer than a month at any job. She denied current drug and alcohol abuse. She also denied any history of drug or alcohol abuse or treatment, but Dr. Bradley noted her medical records indicated otherwise. (Id.)

Dr. Bradley found no significant problems with her conversational skills and no indications of psychotic thinking or perceptual abnormalities. Plaintiff described her mood as generally depressed, but she maintained appropriate affect during the evaluation. Dr. Bradley noted the vagueness of her presentation and stated that he could not confidently diagnose her. He found that she did not report numerous symptoms of any specific psychological disorder. He did not believe she experienced hallucinations. He suggested malingering and polysubstance abuse as diagnoses and found that her psychological condition did not significantly impair her ability to work or her ability to manage money. (Tr. 345-46.)

On November 22, 2005, plaintiff reported that she exhausted her supply of medication during the previous week. Since then, she experienced greater anxiety, increased muscle spasms, increased physical tenseness, difficulty sleeping, and paranoid thoughts. She stated that she had suicidal thoughts but had no plan to commit suicide. During the prior week, she had homicidal thoughts directed at no particular person and carried a knife for an entire day. She reported that she continued to live with her father. She also reported that interactions with people made her irritable. Dr. Reddy gave plaintiff a GAF score of 50. (Tr. 323-24.)

On March 16, 2006, Kathleen King, Ph.D., performed a consultative examination on plaintiff to determine her level of psychological functioning. Dr. King observed that plaintiff fidgeted during the interview but that her hygiene and grooming were good. Dr. King further observed that plaintiff's speech was rapid and pressured and that plaintiff could initiate conversation but frequently went on tangents. Plaintiff stated that she received her GED in her late teens during her brief incarceration for an arms charge. She reported a history of abusive relationships with men. She moved from Illinois to Kansas City in part because her last boyfriend physically assaulted her. She worked briefly as a housekeeper, cashier, and receptionist. She recently worked for one day at a hotel but fell asleep on the job. She had been looking for work since November. At the time of the examination, she lived in a room in her nephew's building. (Tr. 307-08.)

She reported receiving psychiatric therapy in Illinois and looking for treatment locally. Although her medical records indicated the sole diagnosis of bipolar disorder, plaintiff reported a diagnosis of schizophrenia. She heavily abused drugs and alcohol during her younger years. Under the influence of these substances, she attempted suicide several times. She stated that she had not used alcohol in fifteen to twenty years and had not used drugs for two years. She reported hearing laughter at night. She also reported bad nerves and seeing visions but failed to describe the symptoms in greater detail. On her good days, plaintiff begins household tasks but has difficulty completing them. On bad days, she isolates herself in her room. She can drive short distances. She reported anhedonia.[3] She has no friends but interacts regularly with family. She stated that she did not know whether she managed her own finances. (Tr. 308-09.)

Dr. King found that with treatment plaintiff could understand and remember simple

---

[3] Anhedonia is the absence of pleasure from the performance of acts that would ordinarily be pleasurable. Stedman's Medical Dictionary, 93 (28th ed., Lippincott Williams & Wilkins 2006).

instructions and that she could maintain persistence and concentration for simple tasks. Dr. King also found that her social interactions were appropriate for a one-on-one setting despite her self-declared mistrust of others but that "she would do better in situations involving few social interactions." Dr. King diagnosed plaintiff with bipolar disorder and polysubstance dependence in reported remission. (Tr. 309.)

On March 20, 2006, Vanessa Nelson submitted a Third Party Function Report form regarding plaintiff. She reported that plaintiff looked "like a bum," and needed "her hair done real bad." She stated that plaintiff was always depressed and ventured outside only one day a week. Vanessa Nelson also stated that plaintiff was "not good at managing money." She described plaintiff as not very social, stating that other people offended her. She also noted plaintiff's lack of focus, paranoia, and occasional hyperactivity. According to Vanessa Nelson, plaintiff had been fired or laid off from every job due to her short attention span. Vanessa Nelson also reported that plaintiff did not manage stress well and had limited capabilities. (Tr. 290-98.)

On March 31, 2006, on a Psychiatric Review Technique form, Keith Allen, Ph.D., found that plaintiff warranted an assessment of her residual functional capacity because of her diagnoses of bipolar disorder and substance abuse. Dr. Allen also found that the restriction of her daily living activities and her difficulty in maintaining concentration, persistence, and pace were mild and that her difficulty in maintaining social functioning was moderate. On a Mental Residual Functional Capacity Assessment form, Dr. Allen determined that plaintiff might have occasional difficulty with more demanding activities but that she could understand and perform less demanding tasks if she complied with her treatment. (Tr. 272-89.)

On August 22, 2007, Behavioral Health Response referred plaintiff to the Hopewell Center. She complained of anxiety, paranoia, crying spells, difficulty sleeping, and isolation. She reported that she had not used cocaine or marijuana for 32 days. She experienced difficulty sleeping due to the feeling of something crawling on her. She has serious mood swings. She reported that she has been beaten frequently. She also reported nightmares. Dr. Rolf Krojanker, M.D., diagnosed her with schizoaffective disorder and prescribed Seroquel.[4] Plaintiff received a GAF score of 48. (Tr. 361-67.)

---

[4] Seroquel is used to treat certain mental or mood conditions such as schizophrenia and bipolar disorder. WebMD, http://www.webmd.com/drugs (last visited on March 26, 2013).

On December 4, 2007, on a Psychiatric Review Technique form, Kyle DeVore, Ph.D., found that plaintiff warranted a residual functional capacity assessment because of her schizoaffective disorder diagnosis. He also found that she had moderate difficulty in maintaining social function and in maintaining concentration, persistence, and pace but only mild restriction of daily living activities. On a Mental Residual Functional Capacity Assessment form, Dr. DeVore determined that plaintiff retained the ability to perform simple tasks if she complied with her treatment and refrained from substance abuse. (Tr. 391-405.)

On November 24, 2008, Frances Nelson, plaintiff's cousin, submitted a Third Party Function Report form. She reported that plaintiff needed reminders for her medication and doctor appointments and that plaintiff required assistance and encouragement to perform household chores. She stated that plaintiff did not follow written or spoken instructions well. Frances Nelson also stated that plaintiff snapped at authority figures and quit jobs for no reason. She further reported that a male acquaintance had beaten plaintiff for six or seven years, which caused plaintiff to have difficulty sleeping. (Tr. 203-11.)

On December 18, 2008, plaintiff reported paranoia concerning the presence of a stranger in her apartment. She continued to hear voices. She admitted her failure to take her medication as prescribed. (Tr. 376.)

On January 12, 2009, John Rabun, M.D., performed an evaluation on plaintiff. She complained of nervous episodes and sweating hands. Dr. Rabun observed that plaintiff attempted to act nervous and put forth poor effort when performing simple tasks. Plaintiff stated that the voices she hears awaken her, and Dr. Rabun found her statement suggestive of malingering but not genuine hallucination. She did not report substance abuse. She did not exhibit features of depression or mania. She last worked in September 2008 at Washington University. She lives by herself in her own apartment with no source of income. (Tr. 411-12.)

Dr. Rabun observed that plaintiff appeared undistracted when providing answers that benefitted her case and did not exhibit any signs of anxiety. He diagnosed malingering and gave her a GAF score of 70.[5] He found that she had the capacity to focus, concentrate, and remember

---

[5] A GAF score from 61-70 is indicative of some mild symptoms or some difficulty in social or occupational functioning but with a general ability to function well and to have some meaningful interpersonal relationships. DSM-IV-TR, at 34.

instructions as well as the ability to interact appropriately in a social setting and adapt to changes in a work environment. He further found that she could manage her own funds. (Tr. 412-13.)

On February 3, 2009, Dr. DeVore submitted another Psychiatric Review Technique form regarding plaintiff. He found plaintiff's impairment of schizoaffective disorder not severe. He also found that plaintiff suffered from only mild limitations regarding her daily activities, social functioning, and maintaining concentration, persistence, and pace. (Tr. 414-24.)

From July 22 to October 30, 2009, plaintiff regularly attended Narcotics Anonymous meetings. On December 7, 2009, plaintiff tested negative for drug and alcohol use. (Tr. 425-30.)

On February 4, 2010, Lauren Flynn, M.D., performed a medical and psychiatric assessment on plaintiff. Plaintiff reported that her most troubling psychiatric symptoms were depression and anger. She also reported anhedonia and difficulty initiating and maintaining sleep. Dr. Flynn found plaintiff's anhedonia complaint inconsistent with her claim that she frequently felt euphoric even without the use of illicit drugs. She further complained of poor concentration and thoughts of death but denied recent suicidal ideation. She also complained of flashbacks of the physical abuse she suffered from previous relationships and recurrent nightmares. (Tr. 452-53.)

Plaintiff stated that a male acquaintance shattered her left cheekbone and that the incident caused many of her mental health problems. She reported approximately fifty suicide attempts that were typically preceded by physical abuse. The last attempt occurred two and half years earlier. Plaintiff also reported smoking one and a half cigarette packs per day. She admitted using alcohol, crack cocaine, and marijuana but stated that she had quit two and a half years earlier. She resides alone in an apartment, but Queen of Peace pays her rent and utilities.[6] She cleaned offices for her last job in June 2009 for four months. She quit due to transportation issues. She reported never holding a job for longer than five months. (Tr. 453-54.)

Dr. Flynn diagnosed posttraumatic stress disorder, depressive disorder, and nicotine dependence. Plaintiff received a GAF score of 57.[7] Dr. Flynn prescribed Celexa to target plaintiff's

---

[6] Queen of Peace Center is a family-centered behavioral healthcare provider for women with addiction, their children and families. Queen of Peace Center, http://www.qopcstl.org/about-us/ (last visited March 26, 2013).

[7] A score from 51 to 60 represents moderate symptoms (such as flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (such as few friends, conflicts with peers or co-workers). DSM-IV-TR, at 34.

posttraumatic stress disorder and depressive symptoms and Trazodone to alleviate her chronic insomnia. (Tr. 455-56.)

On February 8, 2010, Dr. Krojanker submitted a Mental Medical Source Statement form regarding plaintiff. He indicated that he had not seen plaintiff since December 18, 2008, but found her markedly limited in her daily activities, social functioning, and concentration, persistence, and pace. He also found that plaintiff could work only four hours per day and that her impairments would cause her to miss and be late for work. (Tr. 434-37.)

On February 15, 2010, Steve Bucheit, LPC, also submitted Mental Medical Source Statement form. He found that plaintiff could follow simple one or two-step instructions and interact appropriately with the general public for six hours in an eight-hour work day, but could only interact appropriately with coworkers and supervisors for four hours. He also found that her impairments would cause her to miss three days of work per month and to be late for two days of work per month. His most current diagnosis of plaintiff included cocaine dependence, cannabis abuse, and alcohol abuse, each in remission, and paranoid-type schizophrenia. (Tr. 438-41.)

On March 10, 2010, Lloyd Irwin Moore, Ph.D., performed a psychological evaluation on plaintiff. She reported that she continued to attend Narcotics Anonymous meetings. Dr. Moore observed that plaintiff acted anxiously during the interview. Plaintiff had prescriptions of Trazodone and Citalopram.[8] Dr. Moore diagnosed bipolar I disorder and anxiety disorder and gave her a GAF score of 56. He found mild impairment regarding her daily activities but moderate impairment regarding her social functioning and concentration, persistence, and pace. He also found her capable of handling her own funds. (Tr. 442-47.)

Dr. Moore also submitted a Mental Medical Source Statement form. He found that plaintiff could interact appropriately with coworkers, supervisors, and the general public for eight hours in an eight-hour work day but could follow simple one or two-step instructions for only six hours. He also found that her impairments would cause her to miss work two days per month and to be late two days per month. (Tr. 448-51.)

On April 12, 2010, plaintiff tested negative for drug use. (Tr. 459.)

---

[8] Citalopram is also known as Celexa. WebMD, http://www.webmd.com/drugs (last visited on March 26, 2013).

**Testimony at the Hearing**

A hearing was conducted before an ALJ on April 20, 2010. (Tr. 36-47.) Plaintiff testified to the following. She is 47 years old and resides alone in an apartment. She measures 5 feet, 3 inches and 155 pounds. She stopped attending school in eleventh grade but later received her GED. She receives food stamps but has no other source of income. From time to time, her mother and brother send her a few dollars. She served prison time for violating her probation. In 1987 or 1988, a male acquaintance left a gun in her car, and the police found it. (Tr. 35-37, 46.)

She last worked during the summer of 2009. At her part-time job, she cleaned offices at Atwood Jones for Abcole Company. Before working for Abcole Company, she cleaned offices full-time for Washington University. Her supervisor continually picked on plaintiff and later fired her. Plaintiff is unable to maintain a full-time job because of her difficulty paying attention as well as stress and depression. (Tr. 37-38.)

She currently receives psychiatric care at Barnes Jewish and formerly received care at the Hopewell Center. She has had problems with crack cocaine and alcohol but has been clean for two and a half years. She attends Narcotics Anonymous meetings throughout the St. Louis area. At Queen of Peace, she received psychiatric counseling from an individual named Steve. (Tr. 38-39.)

She has flashbacks concerning her past physical abuse and awakens screaming due to her nightmares. Despite taking medication to alleviate her insomnia, her sleep is poor, and she continues to have nightmares about three times a week. She has low energy and does not feel like getting out of her bed or performing housework. She does not trust other people and thinks that people want to hurt her or that people are "against" her. She cries daily. She also becomes angry and suicidal. She last felt suicidal about a week ago but took no action. When she thinks suicidal thoughts, she usually takes some medication to avoid burning or otherwise harming herself. She last attempted to harm herself a couple years earlier by taking hot pipes and pressing them against her skin. (Tr. 40-41.)

Typically, plaintiff remains awake all night, and gets out of her bed at 10 or 11 a.m. to smoke a cigarette. She smokes a pack per day. She receives about $30 every other week for cigarettes from her cousin. After she smokes, she lies or sits in her house. Besides attending her meetings, she rarely leaves her home. She has no visitors. A case worker from Barnes Jewish reminds her of and takes her to doctor appointments. She occasionally shops for groceries but barely eats. When

she shops, crowds cause her to become irritable. She does not clean her house due to low energy and feeling emotional. She has a driver license but does not drive because of her experience with serious car accidents and her anxiety when riding in a car. She has panic attacks. Her last panic attack occurred the morning before the ALJ hearing. When she left her bed, she panicked because she feared that she would be unable to attend the ALJ hearing. During the panic attacks, she shakes and becomes short of breath. She also suffers tense headaches and perspires. (Tr. 41-45.)

### III. DECISION OF THE ALJ

On June 8, 2010, the ALJ issued a decision that plaintiff was not disabled. (Tr. 17-25.) At Step One of the prescribed regulatory decision-making scheme,[9] the ALJ found that plaintiff had not engaged in substantial gainful activity since November 4, 2008. At Step Two, the ALJ found that plaintiff suffered from hyperlipidemia, mild affective or personality disorder, and polysubstance dependence in long remission, but that her impairments were not of sufficient severity to prevent her from performing basic work-related activities. The ALJ concluded that plaintiff was not disabled. The ALJ also stated that plaintiff could perform jobs existing in significant numbers in the national economy even if he restricted her to jobs requiring only simple, repetitive tasks and only minimal contact with coworkers, supervisors, and the general public. (Tr. 25.)

### IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

---

[9] See below for explanation.

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d 935, 942 (8th Cir. 2009). A five-step regulatory framework is used to determine whether an individual is disabled. 20 C.F.R. §§ 416.920(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. 20 C.F.R. §§ 416.920(a)(4)(i)-(iii). If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform her past relevant work (PRW). Id. § 416.920(a)(4)(iv). The claimant bears the burden of demonstrating she is no longer able to return to her PRW. Pate-Fires, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy. Id.; 20 C.F.R. § 416.920(a)(4)(v).

## V. DISCUSSION

Plaintiff argues the ALJ erred in (1) finding plaintiff's impairments not severe; (2) failing to consider non-medical evidence; and (3) including an alternative finding in his written decision.

### A. Severity

Plaintiff argues that substantial evidence did not support the ALJ's finding that plaintiff had no severe impairments.

A severe impairment is defined as an impairment that significantly limits one's physical or mental ability to do basic work activities. 20 C.F.R. § 416.920(c). "Severity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard, and we have upheld on

numerous occasions the Commissioner's finding that a claimant failed to make this showing." Kirby v. Astrue, 500 F.3d 705, 707-08 (8th Cir. 2007).

"An ALJ may discount a claimant's subjective complaints if there are inconsistencies in the record as a whole." Van Vickle v. Astrue, 539 F.3d 825, 828 (8th Cir. 2008). Additionally, an ALJ may discount a claimant's allegations if the record contains evidence of malingering. O'Donnell v. Barnhart, 318 F.3d 811, 818 (8th Cir. 2003). Failure to seek ongoing medical treatment is another factor an ALJ may consider. Halverson v. Astrue, 600 F.3d 922, 932 (8th Cir. 2010). However, inability to pay can justify a claimant's failure to seek medical treatment. Vasey v. Astrue, 2009 WL 4730688 at *5 (E.D. Ark. 2009). Work performed during the alleged onset period can also be relevant to discredit a claimant's allegations. 20 C.F.R. § 416.971; Weber v. Barnhart, 348 F.3d 723, 725 (8th Cir. 2003); Naber v. Shalala, 22 F.3d 186, 188-89 (8th Cir. 1994).

This court finds that substantial evidence supports the ALJ's decision. Plaintiff maintained employment for four months after her alleged onset date and quit due to lack of transportation. (Tr. 454.) Dr. Bradley suspected plaintiff of malingering during a consultative examination in 2005, and Dr. Rabun questioned the credibility of her complaints in 2008 and also suspected her of malingering. (Tr. 346, 411-13.) Dr. DeVore and Dr. Allen opined that plaintiff could perform simple activities if she complied with treatment and refrained from substance abuse. (Tr. 288, 405.) Further, plaintiff sought medial treatment only intermittently, and the record does not show that she had ever been refused medical treatment due to inability to pay. Finally, plaintiff made several inconsistent statements to medical professionals throughout the record. For example, during an interview with Dr. Bradley, plaintiff denied having friends but stated that she recently lived with a friend and receives financial support from friends. (Tr. 344.) Plaintiff also told the ALJ she lost her office cleaning job because her supervisor picked on her but told Dr. Flynn that she quit due to lack of transportation. (Tr. 38, 454.)

In sum, substantial evidence supports the ALJ's finding that plaintiff suffered no severe impairments.

**B. Non-medical sources**

Plaintiff also argues that the ALJ failed to properly consider non-medical sources. Specifically, plaintiff argues that the ALJ failed to properly consider statements from plaintiff's mother and cousin and Vanessa Nelson as well as Steve Bucheit's opinion.

SSR 06-03p states that non-medical sources, including the evaluations of individuals who have seen the individual in their professional capacity and evidence from spouses, relatives, and friends, should be evaluated using the factors provided by 20 C.F.R. § 416.927(c). These factors include the relationship with the claimant, the length and frequency of contact with the claimant, and the consistency of the evidence with the record as a whole. 20 C.F.R. § 416.927(c).

The ALJ's reasons for finding the statements from plaintiff's mother and cousin and Vanessa Nelson not credible include their lack of medical expertise, their affection for plaintiff, and their tendency to believe and support her. (Tr. 23.) The ALJ also found the statements as well as the form assessment by Steve Bucheit inconsistent with the record as a whole. (Tr. 22-23.) The ALJ did not list specific inconsistencies. However, evidence supporting the ALJ's decision to discredit a claimant's allegations can also support an ALJ's decision regarding the credibility of other sources. Lorenzen v. Chater, 71 F.3d 316, 319 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992). Here, the aforementioned evidence used by the ALJ to find no severe impairment also supports the ALJ's decision to discredit non-medical sources in the instant case.

In addition to the evidence discrediting plaintiff, many specific examples of inconsistency appear throughout the record. For example, her mother stated that plaintiff needed to be reminded to maintain personal hygiene and that she could not be trusted with money. (Tr. 347.) Three days later, Dr. Bradley found plaintiff able to maintain her own personal hygiene and able to manage money. (Tr. 344, 346.) Plaintiff's cousin reported that plaintiff could not follow written or spoken instructions well. (Tr. 208.) About two months later, Dr. Rabun found that plaintiff had the capacity to focus, concentrate, and remember instructions. (Tr. 412.) Further, Vanessa Nelson stated that plaintiff could not maintain focus, but Dr. DeVore found plaintiff not significantly limited in her ability to maintain attention and concentration for extended periods. (Tr. 286, 294.)

Accordingly, plaintiff's argument that the ALJ failed to properly consider non-medical sources is without merit.

## C. Alternative finding

Plaintiff also argues that the ALJ impermissibly included an alternative conclusion in his written decision. In the ALJ's decision, the ALJ stated that a significant number of jobs remained available to plaintiff even if he had found plaintiff restricted to jobs requiring the performance of

only simple repetitive tasks and only minimal contact with coworkers, supervisors, and the general public. (Tr. 24.)

Plaintiff cites no authority prohibiting an ALJ from making alternative findings, and this court can find none. Significantly, on several occasions, the Eighth Circuit has considered alternative findings set forth by an ALJ without mention that such findings are in any manner erroneous or discouraged. See McGeorge v. Barnhart, 321 F.3d 766, 768 (8th Cir. 2003); Caldwell v. Barnhart, 84 F. App'x 714, 715 (8th Cir. 2003); Duran v. Barnhart, 56 F. App'x 753, 754 (8th Cir. 2003).

Further, substantial evidence supports the ALJ's alternative finding. For example, in response to one of plaintiff's previous applications for benefits, the disability examiner explained that she retained the ability to work as a dipper, gluer, and patcher. (Tr. 50-51.) The restrictions discussed by the ALJ are consistent with several medical opinions contained on the record. (Tr. 288, 309, 405.)

## VI. CONCLUSION

For the reasons set forth above, the court affirms the decision of the Acting Commissioner of Social Security under Sentence 4 of 42 U.S.C. § 405(g).

An appropriate Judgment Order is issued herewith.

/S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

**Signed on March 27, 2013.**